UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:20-cv-00210-BO

| | | |
|---|---|---|
| DR. YIZHEN "JENNY" SU, D.O., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **DEFENDANTS' MEMORANDUM OF LAW** |
| | ) | **IN SUPPORT OF PARTIAL MOTION TO** |
| DR. PATRICIA L. MATTO, D.O., DR. | ) | **DISMISS** |
| ANDREW M. FREEMAN, D.O., and | ) | |
| SOUTHEASTERN REGIONAL MEDICAL | ) | |
| CENTER | ) | |
| Defendants. | ) | |

NOW COME Defendants Dr. Patricia L. Matto, D.O., Dr. ("Dr. Matto"), Andrew M. Freeman, D.O. ("Dr. Freeman"), and Southeastern Regional Medical Center ("SRMC") (collectively, "Defendants") and, in compliance with Local Rule of Civil Procedure 7.1, hereby submit their Memorandum of Law in Support of Partial Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## NATURE OF THE CASE

Plaintiff suffered certain medical conditions while a Resident Physician at SRMC where Drs. Matto and Freeman are employed. Following her granted leave under the Family Leave and Medical Act ("FMLA"), she was suspended and eventually terminated. Plaintiff asserts claims against Defendants under the FMLA, 29 U.S.C. § 2601 *et seq.*, the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, and under the common law of the State of North Carolina, including claims for intentional and negligent infliction of emotional distress.

## FACTS ALLEGED IN COMPLAINT

**Employment**

In or about June of 2017, Plaintiff was hired as a Resident Physician ("Resident") at Southeastern Regional Medical Center, Inc. ("SRMC") for postgraduate training in Family Medicine, sponsored by Campbell University School of Medicine, for the purposes of obtaining her medical practice licensure and board certification. [DE-1 ¶ 7].

**Medical Conditions Affecting Performance and Accommodations/Response**

On or about October 19, 2017, Plaintiff had a medical procedure to remove an IUD contraceptive, but her body reacted negatively, causing her to bleed excessively for several weeks. On or about November 7, 2017, Plaintiff had her first of many episodes of lost consciousness ("syncopal episodes") which resulted in multiple Emergency Room ("ER") visits, physician evaluations, and specialist consultations. Plaintiff would experience syncopal episodes almost daily between November of 2017 and January 2018. [DE-1 ¶¶ 9 -11].

By December of 2017, several of Plaintiff's supervisors had noticed changes in her behavior and demeanor, with observed occasional stumbling and disorientation, which caused them to believe Plaintiff might be using illicit drugs. [DE-1 ¶ 12]. SRMC then suspended Plaintiff from the program and ordered her to take blood tests to prove her symptoms were not caused by the use of illicit drugs or other substances. Those blood tests came back negative, and Plaintiff was allowed to resume her residency. [DE-1 ¶¶ 13 - 14].

In late 2017, Plaintiff's symptoms included episodes of very high heartrate and alarmingly low blood pressure, and Plaintiff sought treatment from a cardiologist and several other specialists. At that time, Plaintiff's doctors were not able to specifically identify the cause of her symptoms. Several remedies were attempted, including placing Plaintiff on oral contraceptives, which did

regulate her bleeding and helped to relieve her syncopal episodes, but caused Plaintiff to experience high blood, placing her in jeopardy of having a major stroke and forcing Plaintiff to discontinue that treatment after two months. [DE-1 ¶¶ 15 - 17].

During this time, Plaintiff attempted not to let her medical condition interfere with her residency program. While Plaintiff claims she was successful in meeting the metrics and requirements of the program, Plaintiff also had difficulty walking and was constantly at risk of fainting, especially if she stood in one place for any extended period. She further alleges that she sat down frequently just to maintain consciousness, and experienced bouts of severe nausea and dizziness. [DE-1 ¶¶ 18 - 19].

In 2017 and into 2018, Dr. Donald Morando was Plaintiff's supervising Program Director at SRMC and acknowledged Plaintiff's requests for assistance and accommodation. He also worked with Plaintiff to ensure she was able to continue in the residency program while dealing with her medical difficulties and personally referred her to several specialists to help find treatment for her condition. Dr. Morando made sure that Plaintiff was able to return to the program after she had to take leave in order to have her condition treated. [DE-1 ¶¶ 20 - 21]. While Plaintiff alleges that Dr. Morando was her supervisor, Plaintiff also alleges that other unidentified agents and employees of SRMC "who supervised Plaintiff" were not willing to accommodate her condition. Plaintiff additionally claims that "SRMC's staff" (again unidentified) promoted a culture of competitive hierarchy and a cutthroat environment where perceived weakness is attacked. [DE-1 ¶ 22].

Plaintiff alleges that "this culture of intolerance" was directed to her as well. In one instance, after the oral contraceptive treatment had been stopped and her symptoms had returned, Plaintiff was working to complete her Pediatrics rotation but also was frequenting the ER due to

the severity of her illness. When Plaintiff asked for minor accommodations to enable her to perform the work required of her, she claims her supervising physician threatened, in front of her fellow residents, to fire her from the program unless she completed tasks normally. [DE-1 ¶ 23].

While Plaintiff admits that Dr. Morando intervened, and allowed Plaintiff to bifurcate her Pediatrics rotation in order to accomplish her requirements, she also claims that "others of Defendant SRMC's senior staff" objected to Plaintiff being given any accommodation. She then identifies Dr. Matto, then Vice President of Medical Education, as objecting to Plaintiff being allowed any accommodation, and threatening to terminate her if she fainted one more time. [DE-1 ¶¶ 24 - 25]. Plaintiff alleges Dr. Matto and others showed animosity towards her so that she constantly feared her residency was in jeopardy. She continued to attempt all of her tasks without assistance or accommodation, other than those admittedly already offered by Dr. Morando, causing "immense stress and considerable physical risk". [DE-1 ¶ 26].

**FMLA Request and Response**

In or about June of 2018, Plaintiff began experiencing ever-worsening, "debilitating attacks", such that she repeatedly fell unconscious while at work. At that time, Plaintiff requested medical leave under the Family Medical Leave Act ("FMLA") to seek treatment that would enable her to work "normally." Dr. Morando approved Plaintiff's FMLA leave for ten weeks with no defined date of return. [DE-1 ¶¶ 28 - 29]. Although Plaintiff admits her leave was approved, she claims that, "upon information and belief, several of Defendant SRMC's senior staff, including Defendant Matto and Defendant Freeman believed that Plaintiff should not be allowed to take leave." [DE-1 ¶ 30].

Plaintiff claims that, while she was on her FMLA leave, Dr. Freeman, who was then one of Plaintiff's supervising Attending Physicians, went to other unidentified residents in the program

4818-4266-1586, v. 1

"to solicit complaints against Plaintiff" in direct retaliation for her taking FMLA leave to address her medical condition. [DE-1 ¶¶ 31, 34].

During her FMLA leave, Plaintiff received a referral to the Duke Dysautonomia Clinic but was unable to secure an appointment date until April of 2019. In the same period, in or about June of 2018, Plaintiff attended a conference on Postural Orthostatic Tachycardia Syndrome ("POTS") and obtained a consultation with a POTS specialist, who confirmed her suspicion that she was experiencing POTS. Shortly after receiving confirmation of her POTS diagnosis, but before she obtained substantial treatment or significant medical improvement, Plaintiff allegedly received a phone call from Dr. Morando warning her that she needed to return to work as soon as possible because Dr. Matto had stated her intent to terminate Plaintiff from the residency program unless Plaintiff returned to work immediately. [DE-1 ¶¶ 35 - 36].

**Return to Work**

Plaintiff returned to work in or about August 2018. Although the early return from FMLA leave purportedly disrupted Plaintiff's further diagnoses and treatment, Plaintiff did independent research and self-experimentation to create a "work-around" remedial routine based on the confirmation of POTS. [DE-1 ¶¶ 37 - 39].

Dr. Morando attempted to support Plaintiff's return to work by consulting with her regarding appropriate accommodations and, as a result, agreed that Plaintiff should be permitted to complete her rounds in a wheelchair. He also allowed Plaintiff modifications to her schedule, including working four weeks of twelve-hour day shifts instead of the regular two weeks, so that she could avoid working the lengthier night shifts, which required extended hours and a strenuous pace that Plaintiff felt she could not physically maintain at that time. [DE-1 ¶ 40]. However, upon Plaintiff's return to work, she received a directive from SRMC's Human Resources Department

4818-4266-1586, v. 1

to undergo a physical examination. Plaintiff admits that the examination, which she describes as "cursory", revealed no acute medical reason why Plaintiff could not work extended shifts. Therefore, Human Resources ordered her scheduling accommodations be revoked. [DE-1 ¶ 41].

When Plaintiff attempted to use the wheelchair, she was met with "pushback and antagonism". Plaintiff thus limited her use of the wheelchair, but some still objected to her being allowed to use the wheelchair. Specifically, Dr. Sushma Medikayala, one of the attendings in charge of the Internal Medicine rotation, "verbally opposed Plaintiff's accommodation", and filed a complaint with SRMC protesting the wheelchair use. SRMC then summoned Plaintiff to a disciplinary proceeding in which Dr. Medikayala complained that the accommodation was cumbersome to her work flow and distracting to Plaintiff's fellow residents. Having witnessed Residents offering to assist Plaintiff by pushing her wheelchair, Dr. Medikayala accused Plaintiff of "taking advantage" of her condition and "suggested" that she did not believe Plaintiff should receive any accommodation. [DE-1 ¶¶ 42 - 44]. Subsequently, Plaintiff personally instructed her co-workers not to assist her anymore, for fear of retaliation. [DE-1 ¶ 45].

In or about September 2018, Plaintiff received an "official diagnosis" of POTS and worked to manage her condition, but the medications had debilitating side effects. [DE-1 ¶¶ 46 - 47]. One medication that provided Plaintiff with adrenaline so that she could maintain a higher blood pressure not only caused Plaintiff's blood pressure to fluctuate but also caused her eyesight to rapidly deteriorate, and so she was forced to stop taking it. [DE-1 ¶¶ 48 – 49]. Another medication resulted in an autoimmune reaction, causing Plaintiff to experience lesions in her armpits and groin that were so debilitating that she bled through her clothes. [DE-1 ¶¶ 50 – 51]. Although she admits to the work challenges presented by her medical condition and medications, Plaintiff claims

4818-4266-1586, v. 1

Defendants continued to obstruct Plaintiff's attempts to work around or address her medical issues, both directly and indirectly. [DE-1 ¶ 52].

In 2019, when Plaintiff attempted to schedule appointments to address the bleeding lesions, SRMC's program coordinator Timmie Locklear would not allow her to schedule any time off to receive treatment. Locklear instructed Plaintiff that SRMC considered sick leave to be the same as vacation time and that any medical absences must be scheduled three months in advance. Locklear further explained to Plaintiff that "it wouldn't look good" for her to have time off for medical purposes due to her FMLA leave during the prior year. [DE-1 ¶ 53]. Plaintiff then went to her then supervising Attending Physician, Dr. Almond, and again requested that she be allowed to visit her doctor to receive treatment. Dr. Almond did not grant her request but did write a prescription for Plaintiff to give herself self-administered localized injections. [DE-1 ¶ 54].

Plaintiff successfully passed all of her rotations through the spring of 2019. [DE-1 ¶ 55].

**Alleged False Accusations, Retaliation, and Suspension**

Plaintiff alleges that, both as an Attending supervising Plaintiff and after becoming the Director of Plaintiff's residency program, Dr. Freeman repeatedly targeted Plaintiff with a series of exaggerated and outright false allegations of misconduct, beginning when Plaintiff took her FMLA leave. [DE-1 ¶ 60]. She claims Dr. Freeman accused her of major and minor misconduct, including allegations of patient neglect, insubordination, and unprofessionalism, without basis and in disregard to the readily available facts. On one occasion, he claimed that Plaintiff was a "no-show," when in fact she was fifteen minutes late to clinic due to car trouble and had sent a photo text message showing the problem and letting him know she would be late. [DE-1 ¶ 61]. Plaintiff also alleges Dr. Freeman repeatedly asserted that she "left patients unattended" when Plaintiff left

stable patients under the nurse supervision for short periods of time, and even when Plaintiff was not working, but was out on scheduled and approved leave. [DE-1 ¶ 63].

In or about late November and early December 2019, Plaintiff was told she would be assigned to take on an Internal Medicine rotation so that Dr. Medikayala and Dr. Kaur could take vacation time for Thanksgiving. Plaintiff claims this assignment violated unspecified hospital safety policies, and was unsafe due to the "high patient turnover on that floor". When Plaintiff voiced her opinion, Dr. Medikayala retaliated by emailing Dr. Freeman to formally accuse Plaintiff of "insubordination." Dr. Medikayala also renewed her complaints about Plaintiff's use of her wheelchair, restating that she believed that Plaintiff "takes advantage of [her medical conditions] and there is a component of exaggeration of her condition to gain sympathy from juniors or make it an excuse to avoid work," further claiming that she "had PTSD" from working with Plaintiff. [DE-1 ¶¶ 66 - 67].

During this period, Plaintiff was supervised by both Dr. Medikayala and Dr. Kaur. She claims Dr. Medikayala's animus towards her, arising from Plaintiff's receiving accommodations, is evident from the poor evaluations Plaintiff received during this time and the repeated unsubstantiated personal allegations about Plaintiff, often claiming that that Plaintiff attempted to encourage other Residents to insubordination. [DE-1 ¶¶ 68 – 70].

**<u>Suspension and Denial of Appeal to Campbell University</u>**

In December of 2019, the Residents in Plaintiff's program took a voluntary In-service Training Education Assessment, but more than a quarter of the Residents in the program purportedly did not pass the assessment, including Plaintiff. On or about December 6, 2019 the other non-passing Residents were placed on a remediation plan and were called to sign an acknowledgment of the remediation plan together. In addition, several of those Residents were

8

informed that their charting was deficient or late, and they were told to fix those deficiencies. [DE-1 ¶¶ 71 - 73]. Plaintiff was not called to that meeting, but instead was called to an individual meeting by Dr. Freeman on or about December 10, 2019. During this meeting where Dr. Matto and Jeannie Lenberg were present, Dr. Freeman produced a list of grievances and accusations against Plaintiff and stated that disciplinary actions were forthcoming. Plaintiff claims the accusations were false or had reasonable explanations that should have resolved them, but that her attempts to answer the allegations were rebuffed, and she was not allowed to present witnesses and evidence, nor to have someone with her to witness the meeting. [DE-1 ¶¶ 74 - 76].

Following this meeting, Plaintiff sought counsel from the prior Internal Medicine Program Director, Dr. James West, who advised she had a right to witnesses in the meeting, and a right of refusal to sign any documents without first having reviewed them. On or about December 16, 2019, Dr. Freeman again called Plaintiff into his office and issued her a written "Notice of Concern", which he demanded she sign. Plaintiff requested time to review the document, which caused Dr. Freeman to become visibly angry and agitated, but he agreed to give her a few hours. [DE-1 ¶¶ 77 – 79]. Although Plaintiff admits that she noted that Dr. Almond had added minor complaints against her, she claims he assured Plaintiff that she had done the same work as any other Resident. [DE-1 ¶ 80].

Later that day, Dr. Freeman called Plaintiff back to his office to sign the paperwork. Dr. Townes Leigh and Dr. Almond were also present for the meeting. Dr. Freeman handed her a different document, and demanded that she sign it without further delay. Feeling pressured, intimidated, and overwhelmed, Plaintiff explained that she felt faint and asked if she could leave the room so that she could recover, also asking to be allowed to review the new paperwork overnight and return a signed copy in the morning. Dr. Freeman allegedly "became irate, raising

4818-4266-1586, v. 1

his voice to Plaintiff and yelling that she was insubordinate and that the hospital would 'no longer accommodate' her." [DE-1 ¶¶ 82 - 84]. Plaintiff claims that Dr. Freeman then asserted her refusal to sign the "contract modification" was insubordination and grounds for suspension. At this point, Dr. Leigh typed a one-sentence "notification" stating that refusal to sign could be insubordination, and asked Plaintiff to sign that acknowledgement, which she did. As Plaintiff was signing the acknowledgement, Dr. Freeman crumpled Plaintiff's clinical paperwork, telling her she would not be needing it back, as she was going to be suspended whether she signed her paperwork or not. Plaintiff left distraught, confused, and ill. [DE-1 ¶¶ 85 - 87].

On or about the morning of December 17, 2019, Plaintiff was called into a meeting with Dr. Freeman and Kathleen Berlinghoff, Defendant SRMC's HR director. Plaintiff was informed that she was being suspended for "neglecting to change her schedule" which they stated was "insubordination." Plaintiff claims she was never asked to change her schedule, only instructed to turn it in, and that the issue had never been brought to her attention nor was she given any opportunity to correct whatever the issue was with the schedule. [DE-1 ¶¶ 88 – 89]. Dr. Freeman then stated that Plaintiff's suspension would be for four days and threatened it was reportable to the medical board, placing Plaintiff at risk of having her licensing process suspended. [DE-1 ¶ 91].

On or about December 18, 2019, Plaintiff's grandfather died, and Plaintiff requested leave to attend his funeral. [DE-1 ¶¶ 93 – 94]. Plaintiff claims that Defendants demanded evidence that her grandfather had really died. In response, Plaintiff sent in photo evidence and a letter from the graveyard manager to evidence her grandfather's burial, and Ms. Lenberg later called the graveyard management office to confirm the validity of Plaintiff's submissions. [DE-1 ¶¶ 95 – 96].

About that time, Dr. Matto told Plaintiff she was suspended indefinitely and cited what Plaintiff again describes as a false allegation by Dr. Medikayala that Plaintiff had endangered a

4818-4266-1586, v. 1

patient by prescribing a particular medicine to treat a patient's chest pain. Plaintiff claims the accusation was unfounded and that Defendants neither investigated nor considered facts that showed that the accusation was false and were unable to state any objective basis for the claim that the patient was endangered by the prescription. [DE-1 ¶¶ 97 – 98].

Plaintiff later filed an appeal of her suspension at the direction of a representative of Campbell University. [DE-1 ¶¶ 91 - 92]. On or about January 3, 2020, Plaintiff attended a Review Committee Meeting at Campbell University, which was sponsoring her training. On or about January 13, 2020, Plaintiff was informed that the Campbell University Review Committee had decided not to overturn the suspension. [DE-1 ¶¶ 101 - 102]. Plaintiff claims that "Defendants' dissemination of [the] baseless and false claim of patient endangerment" had serious ramifications for Plaintiff, as Campbell University cited the accusations as one of the main reasons for deciding not to overturn Plaintiff's suspension. [DE-1 ¶ 99]. Plaintiff alleges that the "stress of the blatant targeting of Plaintiff caused her severe emotional distress, resulting in a deep depression, and an inability to regularly eat or even leave her room; she lost ten pounds during this time and friends expressed serious concern for her mental wellbeing." [DE-1 ¶ 100].

**Termination and EEOC Charge**

On or about January 14, 2020, Plaintiff was called to a meeting with Dr. Matto and Kathleen Berlinghoff, which she thought was to discuss her suspension and reinstatement. At this time, Plaintiff was informed that her employment at SRMC was terminated. [DE-1 ¶¶ 103 - 104]. Plaintiff claims she was terminated out of spite and retaliation and that Defendants knew that their action would likely ruin Plaintiff's entire career and claims she has lost her ability to pursue her career, causing her to endure significant undue emotional distress, financial hardship, severe depression and suicidal thoughts. [DE-1 ¶¶ 99, 108 - 109].

11

Plaintiff filed a charge against SRMC with the Equal Employment Opportunity Commission. [DE-1 ¶ 110]. The Charge was filed against SRMC only, not against Dr. Freeman or Dr. Matto. (Ex. A, EEOC Charge). Plaintiff received her corresponding Right to Sue letter on August 13, 2020. [DE-1 ¶ 110].

**The Complaint**

On November 9, 2020, Plaintiff filed the Complaint initiating this action against SRMC and Drs. Freeman and Matto, individually. [DE-1]. In the Complaint, Plaintiff asserts the following claims for relief:

- FMLA Interference
- ADA Discrimination (Termination)
- ADA Retaliation
- ADA Failure to Accommodate
- Intentional Infliction of Emotional Distress
- Negligent Infliction of Emotional Distress
- Wrongful Termination in Violation of Public Policy

In their Partial Motion to Dismiss, Defendants respectfully seek dismissal with prejudice of the following claims:

As to all Defendants:
- Wrongful Termination in Violation of Public Policy under the North Carolina's Persons with Disability Protection Act and FMLA
- Intentional Infliction of Emotional Distress
- Negligent Infliction of Emotional Distress

As to the Individual Defendants, only:
- ADA Discrimination
- ADA Retaliation
- ADA Failure to Accommodate
- Wrongful Termination In Violation of Public Policy under the North Carolina Equal Employment Protection Act and the ADA

**STANDARDS OF REVIEW**

A.    **RULE 12(b)(1)**

4818-4266-1586, v. 1

"Pursuant to Rule 12(b)(1), a court must dismiss all or part of an action over which it lacks subject matter jurisdiction. Whether subject matter jurisdiction exists is a threshold question that must be addressed by the court before considering the merits of the case. *Jones v. Am. Postal Workers Union*, 192 F.3d 417, 422 (4th Cir. 1999). The plaintiff, as the party opposing a Rule 12(b)(1) motion to dismiss, has the burden of proving that subject matter jurisdiction does, in fact, exist. *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991) (citing *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)).

**B.      RULE 12(b)(6)**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). The pleading standard under Federal Rule of Civil Procedure 8(a)(2), "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citing *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

A complaint falls short of the plausibility standard when a plaintiff pleads "facts that are 'merely consistent with' a defendant's liability. . . ." *Id.* While the court accepts plausible factual

Case 7:20-cv-00210-BO   Document 12   Filed 12/28/20   Page 13 of 26
4818-4266-1586, v. 1

allegations made in a complaint as true and considers those facts in the light most favorable to plaintiff in ruling on a motion to dismiss, a court "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." *Eastern Shore Mkt.'s Inc. v. J.D. Assoc.'s, LLP*, 213 F.3d 175, 180 (4th Cir. 2000). Additionally, the tenet that a court must accept a complaint's allegations as true is inapplicable to legal conclusions. *Iqbal*, 556 U.S. at 678. Threadbare recitals of a cause of action's elements, supported by mere conclusory statements, do not suffice. *Id.* (citing *Twombly*, 550 U.S. at 555).

Pursuant to the two-pronged approach set forth in *Twombly* and *Iqbal,* to determine whether a complaint's allegations are sufficient to survive a Rule 12(b)(6) motion to dismiss, a court should first identify allegations that, because they are mere conclusions of law, are not entitled to the assumption of truth. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,* 591 F.3d 250, 255-56 (4th Cir. 2009). The court then should determine which allegations are factual and non-conclusory, and when taken as true, support the claim asserted by the plaintiff. *Id.* Allegations which are mere legal conclusions are not used to determine the sufficiency of the complaint. *Id.* In considering a motion to dismiss, a court may consider documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Brown v. Goodwill Indus. of E. N. Carolina, Inc.*, 361 F. Supp. 3d 558, 562 (E.D.N.C. 2019); *In re PEC Sols., Inc. Sec. Litig.,* 418 F.3d 379, 388 n. 7 (4th Cir. 2005); *Greenhouse v. MCG Capital Corp.,* 392 F.3d 650, 656–57 (4th Cir. 2004).

## <u>ARGUMENTS AS TO ALL DEFENDANTS</u>

I.   **PLAINTIFF'S CLAIM FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY PREMISED UPON THE NCPDPA MUST BE DISMISSED AS TO ALL DEFENDANTS FOR LACK OF SUBJECT MATTER JURISDICTION.**

4818-4266-1586, v. 1

In her claim for Wrongful Termination in Violation of Public Policy (mislabeled as her Fourth Cause of Action) asserted against all of the Defendants, Plaintiff alleges, in part, that her termination violates the established public policy of North Carolina, particularly under North Carolina's Persons with Disability Protection Act ("NCPDPA"), N.C. Gen. Stat. § 168A-1, et sec. and regulations upholding and applying the ADA and FMLA.   In the Complaint, Plaintiff also asserts several claims against the Defendants arising under the ADA.

However, it is well-established that

> There is no jurisdiction over a claim under the NCPDPA when, as here, a plaintiff also begins federal proceedings under the ADA. *See* N.C. GEN. STAT. § 168A-11(c) ("No court shall have jurisdiction over an action filed under this Chapter where the plaintiff has commenced federal judicial or administrative proceedings under... the Americans with Disabilities Act of 1990 ... involving or arising out of the facts and circumstances involved in the alleged discriminatory practice under this Chapter."); see also *Bowling v. Margaret R. Pardee Mem'l Hosp.*, 179 N.C. App. 815, 820–21 (2006) ("The clear meaning of the language of N.C. Gen. Stat. § 168A–11(c) does not allow a plaintiff to file simultaneous federal and state claims, then see which one has a better chance of being successful.").

*McKinney v. Cleveland County Board of Education et al.*, 2020 WL 6803846, at *7 (W.D.N.C. Nov. 19, 2020).  *See also Jefferson v. Biogen Idec Inc.*, 2012 WL 3629219, at *5 (E.D.N.C. Aug. 22, 2012).

 In this action, Plaintiff  brings claims under the ADA.  By the NCPDPA's express language, it does not create a cause of action for a plaintiff bringing an ADA claim.  Because the NCPDPA does not create a cause of action for Plaintiff, Plaintiff cannot pursue a claim of wrongful discharge premised upon an alleged NCPDPA violation.

## II.     PLAINTIFF'S CLAIM FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY UNDER THE FMLA MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM FOR WHICH RELIEF MAY BE GRANTED.

In her claim for Wrongful Termination in Violation of Public Policy (mislabeled as her

4818-4266-1586, v. 1

Fourth Cause of Action), which is asserted against all of the Defendants, Plaintiff alleges, in part, that her termination violates the established public policy of North Carolina, particularly under, among other things, regulations upholding and applying the FMLA. The Supreme Court of North Carolina first pronounced the public policy exception to the employment-at-will doctrine in *Coman v. Thomas Manufacturing Co.,* 325 N.C. 172, 381 S.E.2d 445 (1989):

> "[W]hile there may be a right to terminate a contract at will for no reason, or for an arbitrary or irrational reason, there can be no right to terminate such a contract for an unlawful reason or purpose that contravenes public policy. A different interpretation would encourage and sanction lawlessness, which law by its very nature is designed to discourage and prevent." *Id.* at 175, 381 S.E.2d at 447 (quoting *Sides v. Duke Univ.,* 74 N.C. App. 331, 342, 328 S.E.2d 818, 826 (1985)) (alteration in original).

"As the North Carolina courts have noted, '[t]he public policy exception to the employment-at-will doctrine is a 'narrow exception.' " *Buser v. S. Food Serv., Inc.*, 73 F. Supp. 2d 556, 565 (M.D.N.C. 1999) (quoting *Roberts v. First–Citizens Bank & Trust Co.,* 124 N.C. App. 713, 721, 478 S.E.2d 809, 814 (1996) and citing *Kurtzman v. Applied Analytical Inds., Inc.,* 347 N.C. 329, 334, 493 S.E.2d 420, 423 (1997) (characterizing the exceptions to the employment-at-will doctrine as "narrow")).

"Federal courts applying North Carolina law have declined to hold that an FMLA violation constitutes or creates a public policy exception to the at-will-employment doctrine" and have declined to find that an FMLA violation gives rise to a wrongful termination in violation of public policy claim. *Baucom v. Cabarrus Eye Ctr., P.A.,* 2007 WL 1074663, at *7 (M.D.N.C. Apr. 4, 2007). *See also Buser v. Southern*, 73 F.Supp.2d at 566; *Brewer v. Jefferson–Pilot Standard Life Ins. Co.,* 333 F.Supp.2d 433, 438–39 (M.D.N.C.2004) ("[T]his Court declines to hold that a violation of the FMLA creates a public policy exception to at-will employment."). For this reason,

Plaintiff has no viable claim for wrongful discharge in violation of public policy stemming from an alleged FMLA violation.

## III. THE INFLICTION OF EMOTIONAL DISTRESS CLAIMS MUST BE DISMISSED AS TO ALL DEFENDANTS.

### A. PLAINTIFF'S CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED.

Plaintiff's Complaint fails to state a facially plausible claim for intentional infliction of emotional distress ("IIED") because, as a matter of law, Plaintiff has not alleged any conduct by Defendants that can be legally considered "extreme and outrageous." The elements of an IIED claim are "(1) extreme and outrageous conduct by the defendant (2) which is intended to and does in fact cause (3) severe emotional distress." *Waddle v. Sparks*, 331 N.C. 73, 82, 414 S.E.2d 22, 27 (1992) (quoting *Dickens v. Puryear*, 302 N.C. 437, 452, 276 S.E.2d 325, 335 (1981)).

> The standard for what constitutes extreme and outrageous behavior in North Carolina is "a stringent one." *Id*. In order to support their claim, **plaintiffs must show that defendants' actions were so extreme and outrageous that they exceeded all bounds usually tolerated by decent society.** *Dickens v. Puryear*, 302 N.C. 437, 447, 276 S.E.2d 325, 331 (1981).

*Jolly v. Acad. Collection Serv., Inc.*, 400 F. Supp. 2d 851, 866 (M.D.N.C. 2005) (emphasis added).

North Carolina courts have consistently held that

> **[t]he liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities**. The rough edges of our society are still in need of a good deal of filing down, and in the meantime, plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. There is no occasion for the law to intervene in every case where someone's feelings are hurt. There must still be freedom to express an unflattering opinion....

*Johnson v. Bollinger*, 86 N.C. App. 1, 6, 356 S.E.2d 378, 382 (1987) (quoting *Briggs v. Rosenthal*, 73 N.C. App. 672, 676, 327 S.E.2d 308, 311, cert. denied, 314 N.C. 114, 332 S.E.2d 479 (1985)) (emphasis added). *See also Ennett v. Cumberland Cty. Bd. of Educ.*, 698 F. Supp.2d 557, 560

(E.D.N.C. 2010); *Daniel v. Carolina Sunrock Corp*., 110 N.C. App. 376, 383, 430 S.E.2d 306, 310 (1993); *Hogan v. Forsyth Country Club Co*., 79 N.C. App. 483, 493, 340 S.E.2d 116, 123 (1986); *Smith-Price v. Charter Behavioral Health Sys*, 164 N.C. App. 349, 354, 595 S.E.2d 778, 782-83 (2004). Whether conduct meets this standard is a question of law. *Jolly*, 400 F. Supp. 2d at 866.

All of Plaintiff's allegations of IIED arise the context of her employment at SRMC. Specifically, Plaintiff's claim for IIED is based on the bare, conclusory allegations that: (1) the Individual Defendants acted intentionally and recklessly which foreseeably caused Plaintiff severe emotional distress, and did cause Plaintiff severe emotional distress, (2) Defendants' extreme and outrageous conduct included singling Plaintiff out for public and private critique, repeatedly making false allegations, subjecting her to disciplinary actions, repeatedly penalizing her need for accommodation, preventing her from receiving medical care, and irreparably damaging her ability to pursue her career, (3) as a direct result of these actions by the Individual Defendants, Plaintiff experienced severe emotional distress such that she experienced severe depression, was unable to eat or leave her room, and experienced suicidal thoughts and (4) Plaintiff has suffered damages as a result. [DE-1 ¶¶ 137 – 140].

In point of fact, both the North Carolina state and federal courts are extremely reluctant to find conduct arising in an employment context to be extreme and outrageous. *See Smith v. Computer Task Group, Inc*., 568 F. Supp.2d 603, 621 (M.D.N.C. 2008). Additionally, in the employment context, extreme and outrageous is an "extremely rigorous standard." *Moody-Williams v. LipoScience,* 953 F. Supp. 2d 677, 682 (E.D.N.C. 2013) (quoting *Thomas v. Northern Telecom*, 157 F. Supp. 2d 627, 635 (W.D.N.C. 2000)). For this reason, "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to

support a claim of intentional infliction of emotional distress." *Thomas v. N. Telecom, Inc.*, 157 F. Supp. 2d at 635. To that end,

> termination, allegedly in violation of federal law alone, does not necessarily constitute extreme and outrageous conduct under North Carolina law." *Efird,* 342 F.Supp.2d at 427; *see Pardasani v. Rack Room Shoes Inc.,* 912 F. Supp. 187, 192 (M.D.N.C. 1996) ("Plaintiff has alleged that he was given poor performance evaluations, not given promotions which were given to others, excluded from training and finally terminated from his employment. Assuming these allegation[s] to be true, these actions do not rise to the level sufficient to exceed all bounds usually tolerated by decent society.").

*Bratcher v. Pharm. Prod. Dev., Inc.*, 545 F. Supp. 2d 533, 545 (E.D.N.C. 2008). *See also Faulkner v. Tyco Elecs. Corp.,* 552 F. Supp. 2d 546, 558 (M.D.N.C. 2008) (allegation of discrimination alone, even if true, simply cannot rise to the level of extreme and outrageous behavior.)

    The facts asserted in the Complaint, if taken as true, suggest that the Defendants may have been inconsiderate or unkind to Plaintiff or that they may have accused Plaintiff of being insubordinate and unprofessional. They may have threatened to fire her and may have embarrassed her in front of her peers. Nevertheless, such comments and actions are the exact type of indignities, threats, insults, annoyances, or petty oppressions that do not rise to the level of an IIED claim. Indeed, the case law is replete with examples where the courts have found that conduct in the employment context, which was far more egregious and shocking than that alleged by Plaintiff, did not constitute extreme and outrageous behavior. *See, e.g., Guthrie v. Conroy,* 152 N.C. App. 15, 567 S.E.2d 403 (2002) (defendant holding plaintiff from behind and touching and rubbing her neck and shoulders, placing lampshade on her head, throwing potting soil and water on her, and commenting that he had "always wanted to see [her] in a wet t-shirt" not extreme and outrageous)*; Bendross v. Town of Huntersville,* 159 N.C. App. 228, *4–5 (July 15, 2003) (defendant strained

19

4818-4266-1586, v. 1

working relations with supervisors, subjected plaintiff to three internal investigations, disciplinary action, and slammed chair against wall during conference with plaintiff not extreme and outrageous)*; Ortiz v. Big Bear Events, LLC,* 2013 WL 247444, *4–5 (W.D.N.C. Jan 22, 2013) (inappropriate touching, offensive comments, exposure to pornography and retaliation for seeking legal advice was abhorrent ... but was not "so extreme in degree ... to be regarded as atrocious, and utterly intolerable in a civilized community")*; Payne v. Whole Foods Mkt. Grp., Inc*., 812 F. Supp. 2d 705, 710 (E.D.N.C. 2011) aff'd, 471 F. App'x 186 (4th Cir. 2012) (finding no extreme and outrageous conduct for ostracism, targeted criticism, false and anonymous accusation, and periodic intentional efforts to overwhelm employee with work); *Atkins v. U.S.F. Dugan, Inc*., 106 F. Supp. 2d 799, 810–11 (M.D.N.C. 1999) (finding conduct not extreme or outrageous when employee was told he was too old and sick to handle his job and was allegedly terminated in violation of federal and state discrimination laws); *Johnson v. Colonial Life & Acc. Ins. Co*., 173 N.C. App. 365, 373, 618 S.E.2d 867, 873 (2005) (finding no extreme and outrageous conduct for threats that employee would lose his job and health insurance and accusations in regard to submitting a false claim); *Hogan*, 79 N.C. App. at 493–94, 340 S.E.2d at 122–23 (finding no extreme or outrageous conduct where a supervisor screamed at employees, called them names, cursed at them, disrupted their work, threw menus at them, refused to grant pregnancy leave, and terminated an employee who left work due to labor pains).

Applying the stringent IIED standard of extreme and outrageous conduct to the factual allegations of the Complaint, there can be no doubt that Plaintiff's Complaint fails to demonstrate a facially plausible IIED claim against any of the Defendants. For this reason, Plaintiff's IIED claim must fail as a matter of law.

4818-4266-1586, v. 1

## II.  PLAINTIFF'S CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS MUST BE DISMISSED.

In her Sixth Claim for Relief, Plaintiff asserts, if the Court finds the conduct described in the Complaint was not intentional, then said conduct was negligent and she is entitled to recover damages under a negligent infliction of emotional distress ("NIED") theory.

> To establish a claim for negligent infliction of emotional distress, the plaintiff must prove that "(1) the defendant negligently engaged in conduct, (2) it was reasonably foreseeable that such conduct would cause the plaintiff severe emotional distress ..., and (3) the conduct did in fact cause the plaintiff severe emotional distress."

*Smith-Price v. Charter Behavioral Health Sys.*, 164 N.C. App. at 354, 595 S.E.2d at 782 (quoting *Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304, 395 S.E.2d 85, 97, reh'g denied, 327 N.C. 644, 399 S.E.2d 133 (1990)). However, in the employment context, the North Carolina Court of Appeals has held that the level of proof of extreme and outrageous conduct required in an intentional infliction of emotional distress claim is the same as that required for a NIED action. *Lorbacher v. Housing Authority of the City of Raleigh*, 127 N.C. App. 663.667, 493 S.E.2d 74, 82 (1997).  For this reason, the Court of Appeals in *Lorbacher* stated that:

> We find no principled distinction, however, for employing a higher or lower threshold for one over the other. Therefore, our conclusion that defendant's conduct was not extreme and outrageous with respect to plaintiff's intentional infliction of emotional distress claim also precludes any claim for negligent infliction of emotional distress.

*See also Graham v. Hardees Food System*, 121 N.C. App. 382, 465 S.E.2d 558 (1996) (grant of summary judgment upheld applying extreme and outrageous conduct test to negligent infliction claim in employment case).

Here, as above discussed, the factual allegations of Defendants' alleged conduct do not rise to the level of extreme and outrageous conduct required for an IIED claim.  As a result, under *Lorbacher* and *Graham*, there also are no factual allegations asserted in the Complaint which rise

4818-4266-1586, v. 1

to the level of the extreme and outrageous conduct required to state a cause of action for NIED under North Carolina law. Consequently, Plaintiff's NIED claim must be dismissed.

On top of that, Plaintiff does not allege facts sufficient to show that Defendant engaged in any negligent behavior. Instead, Plaintiff makes only the following conclusory allegations in her NIED claim:

> ¶ 142. In the event that the finder of fact determines that the conduct of Defendants Matto and Freeman as described herein was not "intentional," it was at the very least negligent, and it was reasonably foreseeable that such conduct would cause Plaintiff severe emotional distress.

> ¶ 143. Defendant SRMC was additionally negligent, in failing to intervene or mitigate the humiliation, stress, and harassment inflicted on Plaintiff by Defendants Matto and Freeman and others of its agents who acted to harm Plaintiff as a result of her disability and need for accommodation.

However,

> At least two Fourth Circuit courts have held that "a plaintiff must allege actual acts showing negligence by the defendant, and where the 'complaint contains merely a single, conclusory allegation that [defendant] was negligent,' a dismissal of the claim is proper."*Ijames v. Murdock*, No. 01-0093, 2003 U.S. Dist. LEXIS 4537, at *28 (M.D.N.C. Mar. 21, 2003) (quoting *Mitchell v. Lydall, Inc*., 16 F.3d 410, 1994 U.S. App. LEXIS 2177, at *9-10 (4th Cir. Feb. 10, 1994)). In each case, the court dismissed the plaintiff's NIED claim which contained merely a conclusory allegation of negligence when the complaint otherwise alleged only intentional acts by the defendant. See *Id.* at *29; *Mitchell*, 1994 U.S. App. LEXIS 2177, at *9-10.

*Baucom v. Cabarrus Eye Ctr., P.A*., 2007 WL 1074663, at *5 (M.D.N.C. Apr. 4, 2007). When the Complaint and the language of the NIED are examined, it becomes evident that all of the allegedly factual allegations of the Complaint involve purported intentional acts such as threats, belligerent behavior and acts purported to have been done with the intention to cause severe emotional distress. Therefore, Plaintiff's NIED claim additionally must fail because Plaintiff makes only a naked conclusory assertion of negligence that is not supported by factual

4818-4266-1586, v. 1

enhancement showing acts of negligence.

**ARGUMENTS AS TO THE INDIVIDUAL DEFENDANTS ONLY**

## I. THE ADA CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS MUST BE DISMISSED FOR FAILURE TO STATE A CLAIM BECAUSE THE ADA DOES NOT PROVIDE FOR PERSONAL LIABILITY.

In her Second, Third and Fourth Claims for Relief, Plaintiff asserts claims arising under the Americans With Disabilities Act ("ADA"). It is unclear whether these ADA claims are brought against SRMC only or against all the Defendants. To the extent Plaintiff seeks to bring claims against Drs. Matto and Freeman (collectively, "Individual Defendants") arising under the ADA, those claims should be dismissed pursuant to Rule 12(b)(6), for:

> The Fourth Circuit has held that individual defendants do not face personal liability under the ADA. *Baird ex rel. Baird v. Rose,* 192 F.3d 462, 472 (4th Cir. 1999) . . . Furthermore, individual supervisors cannot be held personally liable for retaliation under Title VII. *Swaim v. Westchester Acad., Inc.,* 170 F.Supp.2d 580, 583 (M.D.N.C. 2001) (citing *Hiler v. Brown,* 177 F.3d 542, 545-47 (6th Cir. 1999)).

*Monroe v. BellSouth Telecommunications, Inc.*, 2003 WL 22037720, at *3 (M.D.N.C. Aug. 15, 2003). Accordingly, because the ADA does not provide for individual liability, including for supervisors, Plaintiff fails to state ADA claims against the Individual Defendants for which relief may be granted. Thus, the Individual Defendants are entitled to dismissal with prejudice of the claims arising under the ADA (Second, Third and Fourth claims for relief).

## II. PLAINTIFF'S CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY UNDER THE NCEEPA AND ADA SHOULD BE DISMISSED BECAUSE THOSE STATUTES DO NOT PROVIDE FOR PERSONAL LIABILITY.

As above stated, in her claim for Wrongful Termination in Violation of Public Policy (mislabeled as her Fourth Cause of Action), which is asserted against all of the Defendants, Plaintiff alleges, in part, that her termination violates the established public policy of North

4818-4266-1586, v. 1

Carolina, particularly under North Carolina's Equal Employment Protection Act (NCEEPA), N.C. Gen. Stat. § 143-422.2 and regulations upholding and applying the ADA. As noted above, , "[t]he public policy exception to the employment-at-will doctrine is a 'narrow exception." *Buser v. S. Food Serv., Inc.*, 73 F. Supp. 2d 556, 565 (M.D.N.C. 1999)

Addressing in turn the statutes upon which Plaintiff's wrongful discharge claims are premised, (the NCEEPA and ADA) the NCEEPA states, in pertinent part, that "[i]t is the public policy of this State to protect and safeguard the right and opportunity of all persons to ... hold employment without discrimination . . . on account of ... handicap by **employers** which regularly employ 15 or more employees." N.C. Gen. Stat. § 143–422.2 (emphasis added). "Under NCEEPA, an action for wrongful discharge can only be asserted against the employer and not against a supervisor in his or her individual capacity." *Arbia v. Owens-Illinois, Inc*., 2003 WL 21297330, at \*7 (M.D.N.C. June 4, 2003) (citing *Cox v. Indian Head Indus., Inc.*, 187 F.R.D. 531, 536 (W.D.N.C. 1999) and *Chung v. BNR, Inc./Northern Telecom, Inc.,* 16 F.Supp.2d 632, 634 (E.D.N.C. 1997)). *See also Huggins v. NC Dep't of Admin*., 2011 WL 3917401, at \*4 (E.D.N.C. June 21, 2011), report and recommendation adopted as modified *sub nom. Huggins v. N.C. Dep't of Admin*., 2011 WL 3917372 (E.D.N.C. Sept. 2, 2011), *aff'd sub nom. Huggins v. NC Dep't of Admin*., 554 F. App'x 219 (4th Cir. 2014); Wilson v. Nash Edgecombe Econ. Dev., Inc., 2020 WL 5594538, at \*8 (E.D.N.C. Sept. 18, 2020) ("In North Carolina, individual employees and supervisors are not amenable to suit at common law for wrongful discharge in violation of public policy.").

With regard to the ADA, as discussed above, the ADA does not provide for individual liability, so it cannot give rise to individual liability under a under a wrongful discharge in violation of public policy claim.

24

4818-4266-1586, v. 1

Because individual employees and supervisors are not subject to personal liability for wrongful termination in violation of public policy under the NCEEPA or the ADA, Plaintiff fails to state a claim for wrongful termination in violation of public policy against the Individual Defendants, and those claims should be dismissed.

## CONCLUSION

For the reasons set forth herein, Defendants respectfully submit that the claims against them for wrongful termination in violation of public policy arising under the NCPDPA and the FMLA and the common law claims for IIED and NIED must be dismissed with prejudice as to all Defendants. The Individual Defendants further respectfully submit that they are entitled to dismissal with prejudice of the claims against them arising under the ADA and of the wrongful termination in violation of public policy claim arising under the NCEEPA and the ADA.

This the 28th day of December, 2020.

CRANFILL SUMNER & HARTZOG LLP

By:     /s/ Benton L. Toups
        BENTON L. TOUPS
        N.C. State Bar No. 28910
        ELIZABETH C. KING
        N.C. State Bar No. 30376
        *Attorneys for Defendant*
        *Southeastern Regional Medical Center*
        101 N. 3rd Street, Suite 400
        Wilmington, NC 28401
        Telephone: (910) 777-6000
        Facsimile: (910) 777-6111
        E-mail:  btoups@cshlaw.com
        E-mail:  eking@cshlaw.com

4818-4266-1586, v. 1

## CERTIFICATE OF SERVICE

I hereby certify that on this, the 28th day of December, 2020, I electronically filed the foregoing **DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF PARTIAL MOTION TO DISMISS** with the Clerk of Court using the CM/ECF system, which will send notifications to each said party as follows:

J. Michael Genest
1610 Highway 70 E.
New Bern, NC 28560
jmg@forgelawgroup.com
*Attorney for Plaintiff*

CRANFILL SUMNER & HARTZOG LLP

By:     /s/ Benton L. Toups
        BENTON L. TOUPS
        N.C. State Bar No. 28910
        ELIZABETH C. KING
        N.C. State Bar No. 30376
        *Attorneys for Defendant*
        *Southeastern Regional Medical Center*
        101 N. 3rd Street, Suite 400
        Wilmington, NC 28401
        Telephone: (910) 777-6000
        Facsimile: (910) 777-6111
        E-mail:  btoups@cshlaw.com
        E-mail:  eking@cshlaw.com

4818-4266-1586, v. 1